IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 15-cv-01252-RBJ (consolidated)

WELLONS, INC. an Oregon corporation,

    Plaintiff,

v.

EAGLE VALLEY CLEAN ENERGY, LLC, a Utah limited liability company,
EVERGREEN CLEAN ENERGY CORPORATION, a Colorado corporation,
CLEARWATER VENTURES, LLC, a Utah limited liability company,
DEAN L. ROSTROM, individually,
KENDRIC B. WAIT, individually,
GEORGE SORENSON, individually,
WILCOX REVOCABLE TRUST U/A 0627/03 WILLIAM WILCOX AND LYN WILCOX
TRUSTEES FOR THE BENEFIT OF WILLIAM WILCOX AND LYN WILCOX,
SEA SOUTH, LLC, a Delaware limited liability company,
WESTERN RESOURCES, LLC, a Utah limited liability company,
COLORADO FORESTRY FUNDING, LLC, a Delaware limited liability company, and
WEST RANGE FOREST PRODUCTS, LLC, a Colorado limited liability company,

    Defendants.

---

EAGLE VALLEY CLEAN ENERGY, LLC,
EVERGREEN CLEAN ENERGY CORPORATION, and
CLEARWATER VENTURES, LLC,

    Counterclaimants,

v.

WELLONS, INC.,

    Counterclaim defendant.

---

EAGLE VALLEY CLEAN ENERGY, LLC,
EVERGREEN CLEAN ENERGY CORPORATION, and

1

CLEARWATER VENTURES, LLC,

    Third-party plaintiffs,

v.

WELLONS GROUP, INC., and
MARTIN NYE,

    Third-party defendants.

---

Civil Action No. 15-cv-02055-KMT

GCUBE INSURANCE SERVICES, INC., a California corporation,

    Plaintiff,

v.

WELLONS, INC., an Oregon corporation,

    Defendant.

---

## ORDER

---

Counterclaim defendant Wellons, Inc. moves for summary judgment on counterclaimants' second cause of action for liquidated damages under the "Consent and Agreement." ECF No. 216. The motion is granted.

## BACKGROUND

On December 21, 2011 Wellons, Inc. ("Wellons") and Eagle Valley Clean Energy, LLC ("EVCE") entered into an contract for Wellons to design and build a biomass power plant in

Gypsum, Colorado. The parties memorialized their agreement in the "Amended and Restated Engineer, Procure, and Construct Contract" ("the EPC contract").

To obtain a construction loan for the project, EVCE executed a "Credit Agreement" with Deutsche Bank Trust Company Americas and lenders affiliated with the bank on August 8, 2013. ECF No. 226-1 ¶ 4; ECF No. 228-1. Deutsche Bank "was not a lender," but instead was "an agent acting at the direction of the lenders." ECF No. 226-2 ¶ 5. In the Credit Agreement's jargon, Deutsche Bank was the "Administrative Agent" and "Collateral Agent" for "the Lenders that [were] from time to time parties" to that agreement. *See* ECF No. 228-1.

Deutsche Bank considered EVCE's loan risky and required additional safeguards from the parties. ECF No. 216 at 3; ECF No. 226-1 ¶ 8. To that end, Deutsche Bank required EVCE and Wellons to sign a "Consent and Agreement" ("the Consent") before it would finance the Credit Agreement. *See* ECF No. 216-1 at 1; ECF No. 226 at 5–6, ¶¶ 3–4. The Consent amended the EPC contract to EVCE's benefit, making it more likely that EVCE would be able to repay the Deutsche Bank loan if Wellons failed to adequately construct the power plant. *See* ECF No. 216 at 3; ECF No. 226 at 5, ¶ 3 (summarizing the Consent's amendments as including "requiring Wellons to secure its performance under the EPC Contract with a letter of credit," "imposing additional Repair Warranty obligations on Wellons," "adding liquidated damages for Wellons' failure to timely achieve Substantial Completion and/or Final Completion," and "eliminating a provision that purports to limit Wellons' financial liability for defects in its work"). The Consent provided that these amended terms would remain in effect "until the time that this Consent is terminated." ECF No. 216-1 art. 1.11; *accord* ECF No. 226 at 8, ¶ 14.

3

EVCE had also sought less expensive financing from the U.S. Department of Agriculture's Rural Utilities Service ("RUS"), but was unable to obtain such a loan until May 2014. ECF No. 216 at 3; ECF No. 226 at 6, ¶ 9. Some of this money was used to pay off the Deutsche Bank loan. ECF No. 216 at 5; ECF No. 226 at 6, ¶ 9.

The project did not go as planned. Wellons and EVCE each claim that the other party breached the EPC contract. *See* Compl., ECF No. 1 ¶¶ 22–25; Am. Countercl., ECF No. 141 ¶¶ 49–62. Wellons now moves for summary judgment on EVCE and other counterclaimants' claims for liquidated damages under the Consent, arguing that the Consent terminated when RUS repaid the Deutsche Bank loan in full. ECF No. 216 at 2.

## STANDARD OF REVIEW

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court will examine the factual record and make reasonable inferences in the light most favorable to the party opposing summary judgment. *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

## ANALYSIS

EVCE's liquidated damages claim depends on the meaning of Sections 1.2, 4.6, and 4.7 of the Consent. Wellons contends that only Section 4.7 applies in this case, and that its plain terms dictate that the Consent terminated when RUS repaid the Deutsche Bank loan. ECF No. 216 at 2. EVCE disagrees, arguing that the Consent continues to apply in favor of RUS under Section 1.2, and that Sections 4.6 and 4.7 must be read together to require a signed agreement to terminate the Consent. ECF No. 226 at 10.[1]

Interpretation of the Consent—a contract—is a question of law for the Court. *See USAA Cas. Ins. Co. v. Anglum*, 119 P.3d 1058, 1059 (Colo. 2005). When interpreting a contract, the primary goal is to determine and give effect to the intent of the parties. *Ad Two, Inc. v. City & Cnty. of Denver*, 9 P.3d 373, 376 (Colo. 2000). The parties' intent is to be ascertained primarily from the language of the agreement itself. *Id.* The Court gives words their plain and ordinary meaning unless it is clear that the parties intended an alternative interpretation. *Chacon v. Am. Family Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo. 1990). Unless the terms in a contract are susceptible to more than one reasonable interpretation, the Court will not look beyond the four corners of an agreement in determining its meaning. *Ad Two, Inc.*, 9 P.3d at 376–77. And any ambiguity in the Consent will be construed against the party that drafted it—Deutsche Bank. *See*

---

[1] EVCE also protests that Wellons' motion should be denied *with prejudice* because it provides a "Factual Background" rather than a "Statement of Undisputed Facts." ECF No. 226 at 9. To be sure, Wellons should have offered a neutral account of the undisputed facts without an advocate's gloss, but this is not a case where the Court might have "to search the record in an effort to determine whether evidence exists which might require submission of the case to a jury." *Truman v. Brannan Sand & Gravel Co.*, No. 10-CV-00801-PAB-KLM, 2011 WL 5865047, at *2 (D. Colo. Nov. 22, 2011). EVCE admits the facts that Wellons presented, disputing only their legal significance. *See* ECF No. 226 at 2–5 ("EVCE disputes Wellons' legal conclusion . . . . Wellons' Allegation C [sic] is an incorrect and incomplete legal conclusion . . . . The facts in Wellons' Allegation D [sic] are undisputed. . . . EVCE disputes the inference . . . . EVCE disputes Wellons' inference . . . . Disputed. As a matter of law . . . ."). Wellons should skip the inferences next time, but I will not strike Wellons' motion based on this harmless error.

*Moland v. Indus. Claim Appeals Office of State*, 111 P.3d 507, 510 (Colo. App. 2004).  The Court will consider each disputed provision in turn.

### A. **Section 1.2.**

Section 1.2 of the Consent is titled "Consent to Assignment" and provides, in relevant part:

> The Collateral Agent [Deutsche Bank] and the Project Company [EVCE] agree that the Secured Obligations may be refinanced, extended, renewed or replaced from time to time, and Contract Party [Wellons] agrees that this Consent will remain in full force and effect and continue to apply in favor of the Collateral Agent [Deutsche Bank] or any replacement administrative agent or collateral agent under such refinancing or other arrangement.

ECF No. 216, Ex. A, § 1.2; ECF No. 226 at 3.

EVCE reads this provision to mean that the Consent—including its section on liquidated damages—survives RUS's repayment of the Deutsche Bank loan because "RUS *refinanced* the obligations to Deutsche Bank." ECF No. 226 at 3–4 (emphasis added).  EVCE asserts that "[t]he Deutsche Bank [l]oan and lien on the Facility was replaced with money from and a lien in favor of RUS, which constitutes a 'refinance' exactly as contemplated by Section 1.2." *Id.* at 11. Next, EVCE contends that "[w]hen RUS refinanced EVCE's financial obligation to Deutsche Bank, RUS obtained rights and benefits under the Consent as a replacement administrative agent or collateral agent." *Id.* at 2.  EVCE then argues that the parties intended this result by pointing to Section XI.N of the EPC contract, *id.* at 11, which "contemplate[s] financing between [EVCE] and [RUS]," ECF No. 215-5 at 74.

But EVCE's interpretation is not the best reading of Section 1.2.  That provision consists of two clauses, the first one capable of standing alone and the second dependent on the former. Neither clause supports EVCE's reading.

### a. First Clause.

Deutsche Bank and EVCE first agreed that the loan "may be refinanced, extended, renewed or replaced from time to time." These words are to be given their ordinary meaning unless it is clear that the parties intended an alternative interpretation. *Chacon*, 788 P.2d at 750. "Refinance" typically means exchanging "an old debt for a new debt, as by negotiating a different interest rate or term or by repaying the existing loan with money acquired from a new loan." *Refinancing*, Black's Law Dictionary (10th ed. 2014). Yet context makes clear that the Consent was not addressing EVCE's ability to "repay[] the existing loan with money acquired from a new loan" in general.

In determining the parties' intent for Section 1.2, the Court must consult other instruments that pertain to the same loan transaction—namely, the Credit Agreement. *See In re Water Rights of Town of Estes Park*, 677 P.2d 320, 327 (Colo. 1984). That agreement states that EVCE "shall have the right, but not the obligation, to prepay, in whole or in part, any Borrowing at any time . . . ." ECF No. 216, Ex. C, § 2.6(a). The Credit Agreement places no limitation on the source of funds used to repay Deutsche Bank. *See id.* Thus, EVCE already had the ability to "refinance" the Deutsche Bank loan with proceeds from an RUS loan when it signed the Consent.

There is no suggestion that Section 1.2 meant to alter the parties' rights and duties if EVCE chose to pay off the Deutsche Bank loan with funds from a less expensive loan. *See* ECF No. 226. And why would there be? Why would Deutsche Bank or its lenders care if EVCE repaid the loan with the proceeds from a less expensive bank loan, a sudden inheritance, or second prize in a beauty contest? Money is money. EVCE's apparent belief that the Consent

revised the Credit Agreement's repayment terms *sub silentio* for no discernible reason shows its position to be unreasonable. *See W. Air Lines v. Hollenbeck*, 235 P.2d 792, 796 (Colo. 1951) ("A meeting of the minds of contracting parties is required not only to make a contract, but also to abrogate or modify it after it is made."); *see also Allen v. Pacheco*, 71 P.3d 375, 378 (Colo. 2003) ("[T]he scope of the agreement must faithfully reflect the reasonable expectations of the parties.").

Instead of governing repayment with funds from an outside loan, the words "may be refinanced" are best understood in context as referring to Deutsche Bank "or any replacement administrative agent or collateral agent" refinancing EVCE's loan itself. After all, the other actions listed in that provision include "extend[ing], renew[ing] or replac[ing]" the loan, all of which only Deutsche Bank (or its replacement) could do. *See Young v. Brighton Sch. Dist. 27J*, 325 P.3d 571, 579 (Colo. 2014) ("Under *noscitur a sociis*, 'a word may be known by the company it keeps.'" (quoting *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 287 (2010)). And reading "refinanced" in harmony with these other actions explains the word's purpose: indicating that Deutsche Bank reserves the right to modify the loan's interest rate or loan term in this and other ways. By contrast, the loan could have been "refinanced" in the broad sense from EVCE's perspective not only without affecting Deutsche Bank (or Wellons), but also without Deutsche Bank's (or Wellons') knowledge; EVCE was not required to disclose the source of its repayment monies. *See* ECF No. 216, Ex. A, § 1.2; ECF No. 216, Ex. C, § 2.6(a).

Although courts are loathe to qualify express contract terms by implication, this impulse must yield to sufficiently clear indicia of the parties' intent for such an interpretation. *See Allen*,

71 P.3d at 378.  The Consent was forged by Deutsche Bank, EVCE, and Wellons—not by Bryan Garner, editor-in-chief of Black's Law Dictionary.  In addition to the aforementioned reasons for reading the Consent's use of the words "may be refinanced" narrowly, consider the lengthy, clunky sentence that would result from adding the appropriate limiting language into this provision:

> The Collateral Agent [Deutsche Bank] and the Project Company [EVCE] agree that the Secured Obligations may be refinanced, extended, renewed or replaced <u>by the Collateral Agent [Deutsche Bank] or any replacement administrative agent or collateral agent</u> from time to time, and Contract Party [Wellons] agrees that this Consent will remain in full force and effect and continue to apply in favor of the Collateral Agent [Deutsche Bank] or any replacement administrative agent or collateral agent under such refinancing or other arrangement.

*See* ECF No. 216, Ex. A, § 1.2; ECF No. 226 at 3.

EVCE briefly argues that if the parties had intended to address only refinancing initiated by Deutsche Bank, then they would have used the defined term "Qualified Assignee" instead of "replacement administrative agent or collateral agent" in Section 1.2's second clause.  *See* ECF No. 226 at 16.  There is no basis for this view.  EVCE cites Section 9.4(b) of the Credit Agreement, which provides that "any Lender may at any time assign to one or more Qualified Assignees all or a portion of its rights and obligations under this Agreement."  ECF No. 216, Ex. C, § 9.4(b).  Deutsche Bank was not a lender, so it could not have assigned its interests to a Qualified Assignee under this provision.

Thus, the most faithful reading of Section 1.2's first clause—the only meaning that accounts for the preexisting Credit Agreement, that makes sense of the words surrounding "refinanced," and that Deutsche Bank had reason to include—is that Deutsche Bank's loan to

EVCE "may be refinanced, extended, renewed or replaced" by Deutsche Bank, or its replacement, "from time to time."

### b. Second Clause.

In Section 1.2's second clause, Wellons acquiesces that "such refinancing or other arrangement" will cause the Consent to "remain in full force and effect and continue to apply in favor of" Deutsche Bank "or any replacement administrative agent or collateral agent." *See* ECF No. 216, Ex. A, at 3; ECF No. 226 at 3. "[S]uch refinancing" refers to the potential loan modification by Deutsche Bank or its replacement described above, so at the outset Section 1.2's second clause does not apply to RUS's repayment of the Deutsche Bank loan. But even if the first clause could be interpreted differently, other language compels this understanding of the second clause as well.

Above all, the terms "Administrative Agent" and "Collateral Agent" are defined in the Credit Agreement to include only Deutsche Bank and successor agents "appointed under Article VIII." ECF No. 216, Ex. C, § 1.1. Article VIII says that certain lenders "shall have the right, in consultation with the Borrower [EVCE], to appoint a successor, which shall be a bank with an office in New York, New York, or an Affiliate of any such bank with an office in New York, New York." *Id.* § 8.6(a). RUS, a federal agency, does not qualify as a bank with an office in New York.

EVCE tries to avoid this result by pointing out that Section 1.2 of the Consent uses the phrase "any replacement administrative agent or collateral agent" without capitalizing the words "Administrative Agent" or "Collateral Agent," suggesting that the parties did not intend to define those terms by reference to the Credit Agreement. ECF No. 226 at 15.

10

But though the lack of capitalization is one clue as to the parties' intent, there are several other signs that cut against EVCE's interpretation. In Section 1.2, the adjective "any" is used to refer to a member of the group of all possible agents without limitation. Hence no capitalization was used in referencing every potential "administrative agent" and "collateral agent." By contrast, the capitalized terms "Administrative Agent" and "Collateral Agent" serve as proper nouns referring solely to the individual agent(s) presently in those roles, i.e., Deutsche Bank before RUS paid off the loan. ECF No. 216, Ex. C, at 1. This understanding is reinforced by the drafting style used in the Credit Agreement, which defines "Administrative Agent" to include "any successor administrative agent" and "Collateral Agent" to include "any successor collateral agent," in both cases eschewing capitalization when referring to every possible agent. *See* ECF No. 216, Ex. C, § 1.1.

EVCE's interpretation would also drive a wedge between the linked loan documents. In EVCE's view, RUS is an "administrative agent" and "collateral agent" for the purposes of the Consent, but it is not an "Administrative Agent" or "Collateral Agent" for the purposes of the Credit Agreement. Compounding this oddity, EVCE appears to believe the Consent is still in effect while the Credit Agreement with Deutsche Bank and its lenders has terminated, *see* ECF No. 226 at 7, even though the Consent explicitly relies on definitions in the Credit Agreement no fewer than eight times, *see* ECF No. 216, Ex. A, at 1–3, 5, 10, 14.

Even if the parties did intend to depart from the meaning given to these terms in the Credit Agreement, the text of Section 1.2 cannot sustain EVCE's reading. EVCE interprets the phrase "replacement administrative agent or collateral agent" to "generically refer[] to a person that takes the place of another." ECF No. 226 at 16. That cannot be. If the Consent did not

11

mean to give any effect to the terms "administrative agent" or "collateral agent," then it would not have used those words. *See Copper Mtn., Inc. v. Indus Systems, Inc.*, 208 P.3d 692, 697 (Colo. 2009). According to a Thomson Reuters website, the phrase "administrative agent" means "[t]he financial institution that acts as agent for a syndicate of lenders in administering the loan facility with the borrower under a loan agreement." *Administrative Agent*, Practical Law, http://us.practicallaw.com/1-382-3216. "Collateral agent" means "[t]he financial institution that holds the collateral on behalf of the lenders under a syndicated loan agreement as security for performance of the borrower's obligations under the loan agreement." *Collateral Agent*, Practical Law, http://us.practicallaw.com/1-382-3344. Again, RUS is not a financial institution, so the ordinary meaning of Section 1.2 precludes RUS from taking the place of Deutsche Bank. Nor is RUS an "agent" working on behalf of lenders; RUS itself is EVCE's new lender.

Additionally, untethering Section 1.2 from the Credit Agreement's definitions could make this provision unworkable. Absent direct repayment, as happened here, how would a new lender know its funds had been used to repay the Deutsche Bank loan so that it was subject to the Consent? If EVCE cobbled together repayment money from multiple lenders, would they all share Deutsche Bank's shoes and split its obligations? And what if EVCE tried to pay off the loan by converting to a corporation and selling stock—would its shareholders take on the Consent's contractual rights and responsibilities? EVCE's interpretation raises practical questions like these, but leaves them unanswered.

Other parts of the Consent show EVCE's interpretation of Section 1.2 is unreasonable as well. Section 1.10 gave Deutsche Bank the right to assign its interest if the "transferee assumes in writing all of the obligations of" Deutsche Bank under the Consent. ECF No. 216, Ex. A, §

1.10.  But EVCE insists that RUS's repayment of the Deutsche Bank loan subjects RUS to all of Deutsche Bank's obligations automatically, even without a written agreement to this effect.  *See* ECF No. 226 at 13.  Likewise, Section 4.8 limits the Consent's reach to "the parties hereto and their permitted successors and assigns."  ECF No. 216, Ex. A, § 4.8.  EVCE asserts that this language encompasses any entity that repays the Deutsche Bank loan, rendering the word "permitted" superfluous.  *See* ECF No. 226 at 13.

EVCE's interpretation of the Deutsche Bank-drafted document would also serve no purpose for anyone but itself.  As counsel for EVCE suggested at the February 21st hearing, a replacement administrative agent or collateral agent for Deutsche Bank's lenders would likely want the Consent to remain in effect.  Such a replacement agent might be a Deutsche Bank affiliate, prompting the bank to include this language.  But EVCE stretches Section 1.2 beyond mere replacement agents to include "replacement lenders."  *See, e.g.*, ECF No. 226 at 6.  This reading would not benefit Deutsche Bank or its affiliates; understandably, the bank has offered the Court no opinion on this issue.  *See* ECF No. 226, Ex. J, ¶¶ 7–8.  This reading also would not benefit RUS, which negotiated for its own credit agreement and terms, *see* ECF No. 226-1, ¶¶ 13–14; at the hearing it took no position in this dispute either.  I am left reviewing a strained interpretation, purportedly intended by a party who pleads ignorance about it, and supposedly for the benefit of another party who is indifferent to it.  Something is not right here.

Last, even if Section 1.2 were somehow ambiguous, the rules of contract interpretation would reject EVCE's reading.  If a contract term is susceptible to more than one reasonable interpretation, the Court may look beyond the four corners of an agreement in determining its meaning.  *Ad Two, Inc.*, 9 P.3d at 376–77.  The smoking gun here is an email from Dean

13

Rostrom, EVCE's representative, writing: "Yesterday we closed on the refinancing of the construction loan. Deutsche Bank is out and RUS is in! . . . Rob, *the consent agreement is no longer effective* so you can cancel the letter of credit immediately." ECF No. 216, Ex. F (emphasis added). EVCE now argues that this email does not mean what it says. EVCE claims to have "verbally promised Wellons that it could cancel the Letter of Credit if it was not necessary for the RUS Loan (which it was not)," and Mr. Rostrom's email merely followed through on this promise. ECF No. 226 at 8–9. But the email does not merely say Wellons can cancel the letter of credit; it also says the Consent "is no longer effective." Moreover, EVCE could not have made an oral promise to override the letter-of-credit requirement because Section 4.6 of the Consent prevents any term from being waived except by a written agreement. ECF No. 216, Ex. A, § 4.6. And EVCE submits no evidence to support its story about this alleged verbal agreement. *See* ECF No. 226. Taking all inferences from the available evidence in favor of EVCE, Mr. Rostrom's email still supports the view that RUS did not step into Deutsche Bank's shoes and keep the Consent in place.

As a last resort, the Court would resolve any ambiguity in Section 1.2 by construing the term against its drafter, Deutsche Bank. *See Higby Crane Serv., LLC v. Nat'l Helium, LLC*, 751 F.3d 1157, 1166 (10th Cir. 2014). That task is somewhat complicated by the Consent involving three parties. Said differently, this rule is sometimes framed as "ambiguities are to be interpreted in favor of the promisee." 11 Williston on Contracts § 32:12 (4th ed. 1999). It "is intended to aid a party whose bargaining power was less than that of the draftsperson," i.e., "the underdog." 5-24 Corbin on Contracts § 24.27 (rev. ed. 1998). Thus, even if EVCE could support another reasonable interpretation of Section 1.2 and undermine the extrinsic evidence Wellons produced,

14

construing this provision against its drafter would favor Wellons' interpretation since the Consent works primarily to Wellons' detriment.

### B. Sections 4.6 and 4.7.

EVCE also argues that the Consent is still in effect because Sections 4.6 and 4.7 jointly govern termination of the Consent, and, as both sides admit, Section 4.6 was not satisfied even though Section 4.7 was.  *See* ECF No. 216 at 10; ECF No. 226 at 8, 10; ECF No. 228 at 3. Those provisions state:

> 4.6 <u>Amendment, Waiver</u>.  Neither this Consent nor any of the terms hereof may be terminated, amended, supplemented, waived or modified except by an instrument in writing signed by the Contract Party [Wellons] and the Collateral Agent [Deutsche Bank] and . . . the Project Company [EVCE].
>
> 4.7 <u>Termination</u>. This Consent and the rights and obligations of the parties hereunder shall terminate on the date when (a) all Secured Obligations . . . of the Project Company [EVCE] under the Credit Agreement and the other related "Loan Documents" . . . have been indefeasibly paid in full . . . , (b) no commitments to make any Loans remain outstanding, and (c) none of the Collateral Agent [Deutsche Bank], the Administrative Agent [Deutsche Bank] or the Lenders . . . has any remaining ownership interest or security interest of any kind in the Project or the Project Company [EVCE] . . . .

ECF No. 216, Ex. A, §§ 4.6–.7.

As EVCE sees it, the Consent cannot be terminated without a written instrument signed by the parties under Section 4.6 *and* satisfaction of the three termination conditions under Section 4.7.  ECF No. 226 at 3.  EVCE argues that focusing on Section 4.7 to the exclusion of Section 4.6 would render the latter provision "meaningless."  *Id.* at 14.

EVCE's reading is mistaken here, too.  What do you do if you're driving down the road and see a red light next to a green light up ahead?  You check if the two stoplights are meant for different roads before slamming your brakes.  It's the same here.  One provision requires a

15

written agreement if the parties want to terminate the Consent early; one requires the Consent to be terminated automatically if three conditions are met. These rules govern two different termination paths.

Section 4.6 recites the common proviso that a written contract may not be changed without another signed agreement. That is, the contract *may* be changed, but only through an agreement in writing. Section 4.6 is titled "Amendment, Waiver" and focuses on those types of changes, covering efforts to terminate or "amend[], supplement[], waive[] or modif[y]" the Consent or its terms. No other provision in the Consent allows its terms to be amended, supplemented, waived, or modified. *See* ECF No. 216, Ex. A. And no other provision lets the Consent be terminated at the parties' pleasure. *See id.*

By contrast, Section 4.7 sets up the process for automatic termination of the Consent. The provision is titled "Termination" and says that the Consent "shall" terminate if three conditions are met. On its face, Section 4.7 termination does not require a signed agreement under Section 4.6. If it were supposed to incorporate this requirement, Section 4.7 would instead say that the Consent "may" terminate if the three conditions are met, since the parties could choose not to ratify such termination by withholding written consent under Section 4.6. Additionally, two other parts of the Consent refer to the contract period by writing that the Consent remains in effect "until the time that this Consent is terminated pursuant to Section 4.7." ECF No. 216, Ex. A, at 1, 6. The parties surely would have written "until the time that this Consent is terminated pursuant to *Sections 4.6 and 4.7*" if they had intended for the agreement to last until both provisions were satisfied.

Viewed together, these provisions reveal Section 4.6 functions like a condition precedent while Section 4.7 operates like a condition subsequent, to analogize to the language of contract law. Under Section 4.6, a signed writing agreeing to change the Consent "must exist . . . before" the Consent can be altered. *Condition*, Black's Law Dictionary (10th ed. 2014). Under Section 4.7, the three enumerated requirements are "condition[s] that, if [they] occur[], will bring something else," i.e., the entire Consent, "to an end." *Id.* Construed in this way, each provision is meaningful and advances the Consent's purpose.

Once again, even if EVCE could show its interpretation of Section 4.6 to be reasonable, Mr. Rostrom's email declaring the Consent "no longer effective" without a signed writing and the rule of *contra proferentem*—construing the provision against its drafter—would favor Wellons' interpretation. *See supra* Part A.2.

Accordingly, the Consent terminated in May 2014 when RUS repaid the Deutsche Bank loan and satisfied Section 4.7. EVCE and the other counterclaimants may not now pursue liquidated damages under the expired Consent.

**ORDER**

For the foregoing reasons, Wellons, Inc.'s Motion for Partial Summary Judgment Re: Consent and Agreement [ECF No. 216] is GRANTED.

DATED this 7th day of March, 2017.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge