IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 15-cv-01252-RBJ (consolidated)

WELLONS, INC., an Oregon corporation,

      Plaintiff,

v.

EAGLE VALLEY CLEAN ENERGY, LLC, a Utah limited liability company,
EVERGREEN CLEAN ENERGY CORPORATION, a Colorado corporation,
CLEARWATER VENTURES, LLC, a Utah limited liability company,
DEAN L. ROSTROM, individually,
KENDRIC B. WAIT, individually,
WESTERN RESOURCES, LLC, a Utah limited liability company,
COLORADO FORESTRY FUNDING, LLC, a Delaware limited liability company, and
WEST RANGE FOREST PRODUCTS, LLC, a Colorado limited liability company,

      Defendants.

---

EAGLE VALLEY CLEAN ENERGY, LLC,
EVERGREEN CLEAN ENERGY CORPORATION, and
CLEARWATER VENTURES, LLC,

      Counterclaimants,

v.

WELLONS, INC.,

      Counterclaim defendant.

---

EAGLE VALLEY CLEAN ENERGY, LLC,
EVERGREEN CLEAN ENERGY CORPORATION, and
CLEARWATER VENTURES, LLC,

      Third-party plaintiffs,

v.

WELLONS GROUP, INC., and
MARTIN NYE,

       Third-party defendants.

---

Civil Action No. 15-cv-02055-KMT

GCUBE INSURANCE SERVICES, INC., a California corporation,

       Plaintiff,

v.

WELLONS, INC., an Oregon corporation,

       Defendant.

---

## ORDER ON PENDING MOTIONS

---

       Defendants move for summary judgment on plaintiff's First, Third, Fifth, Sixth, and Seventh Claims for Relief. ECF No. 246. The motion is granted in part and denied in part. This order also addresses several other pending motions.

## BACKGROUND

       On December 21, 2011 Wellons, Inc. and Eagle Valley Clean Energy, LLC ("EVCE") entered into an contract for Wellons to design and build a biomass power plant in Gypsum, Colorado. The parties memorialized their agreement in the "Amended and Restated Engineer, Procure, and Construct Contract" ("the EPC contract"), and Wellons began work on the facility.

On October 20, 2014, after a payment dispute arose, Wellons recorded a mechanic's lien on the facility's property for $14,441,874.31 plus interest. ECF No. 246-8 at 1. Wellons recorded an amended lien on December 16, 2014. ECF No. 246-9 at 1.

On June 12, 2015 Wellons brought this suit against EVCE and several affiliated entities and employees, including Evergreen Clean Energy Corporation ("Evergreen"), Clearwater Ventures, LLC ("Clearwater"), Western Resources, LLC ("Western"), Colorado Forestry Funding, LLC ("CFF"), West Range Forest Products, LLC ("WRFP"), Dean Rostrom, and Kendric Wait. ECF No. 1. Wellons filed its third amended complaint a year later on June 21, 2016. ECF No. 139. This complaint raises seven claims for relief: (1) breach of contract against EVCE; (2) default of a promissory note against Evergreen; (3) foreclosure of a mechanic's lien against EVCE and Clearwater; (4) unjust enrichment against EVCE, Evergreen, and Clearwater; (5) fraudulent transfers against all defendants; (6) civil conspiracy against all defendants; and (7) breach of directors' duties against Mr. Rostrom and Mr. Wait. Defendants now move for summary judgment on Wellons' First, Third, Fifth, Sixth, and Seventh Claims. ECF No. 246. The motion has been fully briefed. *See* ECF Nos. 281, 287.

## STANDARD OF REVIEW

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim."

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court will examine the factual record and make reasonable inferences in the light most favorable to the party opposing summary judgment. *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

## ANALYSIS

## I. <u>DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>.

Defendants move for summary judgment on Wellons' claims for breach of contract, mechanic's lien foreclosure, fraudulent transfers, civil conspiracy, and breach of directors' duties. I will address each issue in turn.

### A. **Breach of Contract.**

The validity of Wellons' breach of contract claim depends on the meaning of the EPC contract. The EPC contract specifies that it is governed by Utah law. ECF No. 246-1 at 73. Under Utah law, the primary goal of contract interpretation is to ascertain the intent of the parties at the time of contracting. *Equine Assisted Growth & Learning Ass'n v. Carolina Cas. Ins. Co.*, 266 P.3d 733, 736 (Utah 2011). When contractual language is unambiguous, the parties' intentions are determined from the contract's plain meaning as a matter of law. *Reighard v. Yates*, 285 P.3d 1168, 1177 (Utah 2012). A contractual term is ambiguous if it is capable of more than one reasonable interpretation. *Daines v. Vincent*, 190 P.3d 1269, 1275 (Utah 2008). Extrinsic evidence may be admitted to support a plausible claim of textual ambiguity. *Id.* at 1278. When a contract is ambiguous, summary judgment is appropriate only if the evidence,

viewed in the light most favorable to the nonmoving party, leaves no issue of material fact to be resolved. *Peterson v. Sunrider Corp.*, 48 P.3d 918, 927 (Utah 2002).

Defendants argue that the undisputed evidence shows Wellons did not perform its own contractual duties and thus cannot maintain an action for breach of contract. A prima facie case for breach of contract requires: "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001). Regarding performance by the party seeking recovery, only a material breach will excuse further performance by the other party. *McArthur v. State Farm Mut. Auto. Ins. Co.*, 274 P.3d 981, 987 (Utah 2012). Therefore, "[n]ot every minor failure justifies nonperformance and rescission of the contract." *Saunders v. Sharp*, 840 P.2d 796, 806 (Utah Ct. App. 1992). Such a breach "must be something so substantial that it could be reasonably deemed to vindicate the other's refusal to perform; and this is a matter of affirmative excuse or justification, which the party so claiming has the burden of demonstrating." *Zion's Properties, Inc. v. Holt*, 538 P.2d 1319, 1321 (Utah 1975). Utah courts have evaluated whether a breach is material by applying the Restatement of Contract's five factors:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; [and]
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Cross v. Olsen*, 303 P.3d 1030, 1036 (Utah Ct. App. 2013) (quoting Restatement (Second) of

Contracts § 241 (1981)); *see also, e.g.*, *Grassy Meadows Sky Ranch Landowners Ass'n v. Grassy*

*Meadows Airport, Inc.*, 283 P.3d 511, 518 (Utah Ct. App. 2012) (same); *GeoNan Properties,*

*LLC v. Park-Ro-She, Inc.*, 263 P.3d 1169, 1175 n.6 (Utah Ct. App. 2011) (same).

### 1. *Formal Notice of Final Completion.*

First, defendants assert that Wellons committed a material breach by failing to comply

with the EPC contract's process for determining if Wellons has achieved "Final Completion" of

the project. Section XI.E.5 of the EPC contract provides that Wellons "shall . . . notify" EVCE

in writing when it believes it has achieved Final Completion. ECF No. 246-1 at 57. EVCE must

then determine whether Final Completion has been achieved, and it must notify Wellons of its

determination. *Id.* If EVCE informs Wellons that Final Completion has not been achieved, then

Wellons must remedy the deficiencies and resubmit notice of Final Completion. *Id.* The parties

may repeat this process until EVCE determines that Final Completion has been achieved, or

either party may instead invoke the EPC contract's dispute resolution process. *Id.*

Wellons concedes that it did not provide written notice of Final Completion, but it

contends that defendants were not prejudiced by its nonperformance of this contractual duty.

ECF No. 281 at 4. I agree. Section XI.E.5's written notice requirement was not a material

provision of the EPC contract. If Wellons adequately completed the project, then informal notice

of this result would not deprive EVCE of the benefit the company expected to receive; informal

notice would forfeit Wellons' claim to millions of dollars if it constituted a material breach; and

such notice would still comport with the standards of good faith and fair dealing. *See*

Restatement (Second) of Contracts § 241 (1981). It is therefore a "minor failure" rather than a material breach.

In defendants' view, Wellons' failure to adhere to Section XI.E.5 "deprives [EVCE] of its right to a completed, operational plant before it must pay any final amounts to Wellons." ECF No. 246 at 7–8. Not so. If Wellons did not substantially perform under the contract, then it is not entitled to final payment. Conversely, if Wellons did substantially perform, then it is entitled to payment less "any cost or other loss that [it] has avoided by not having to perform." *Ford v. Am. Exp. Fin. Advisors, Inc.*, 98 P.3d 15, 26 (Utah 2004) (emphasis omitted) (quoting Restatement (Second) of Contracts § 347 (1981)). Wellons' compliance with this notice provision might have helped avoid a lawsuit, but, standing alone, it would not have changed the fact that Wellons did or did not achieve Final Completion.

Defendants also argue that they were disadvantaged because Wellons' repair warranty extends "for a period of one (1) year from the date of Final Completion," and its liability insurance "shall be maintained without interruption from the date of commencement of the Work until Final Completion of the Work." ECF No. 246 at 8 n.8 (quoting ECF No. 246-1 at 54, 61). Yet defendants do not contest that EVCE knew Wellons believed it had achieved Final Completion in the spring of 2014. *See* ECF No. 287; *see also* ECF No. 281 at 4; ECF No. 281-10 at 2 (alerting Mr. Rostrom and Mr. Wait on February 27, 2014 that Wellons is "in a safe position to declare final completion . . . once we get through the 30 day test"); ECF No. 283 at 5 (informing Mr. Rostrom and Mr. Wait on March 27, 2014 that the facility successfully completed this 30-day test, and noting that "[t]he facility has been accepted for operation under all project documents"). If EVCE had actual knowledge of Final Completion, then Wellons'

failure to provide formal notice had no effect on EVCE's enjoyment of Wellons' repair warranty and liability insurance. And even if defendants claimed that they did not have actual knowledge, then we would have a fact dispute that could not be resolved on summary judgment. Summary judgment is therefore denied on this question.

## 2. *Achievement of Final Completion.*

Next, defendants contend that Wellons did not achieve Final Completion. The EPC contract states that Wellons cannot achieve Final Completion until the remaining items on a defined "Punch List," "taken as a whole and in [EVCE's] commercially reasonable discretion," are "not estimated to require a cost to complete in excess of $400,000." ECF No. 246-1 at 56. Defendants cite three pieces of evidence for its view that this limit was exceeded.

First, EVCE's engineer concluded at an unspecified time, presumably in October 2014, that the Punch List items would cost more than $400,000 to complete. ECF No. 246-2 at ¶ 8. But this opinion is disputed. On February 27, 2014 Wellons told Mr. Rostrom and Mr. Wait that it projected to have some Punch List items remaining, but that the cost of these items would not exceed $400,000. ECF No. 281-10 at 2. On October 27, 2014 Wellons wrote Mr. Rostrom that some of the items EVCE alleged were incomplete "have either been completed or are not within Wellons' scope of work." ECF No. 281-14 at 3. And on November 4, 2014 Wellons contested several of Mr. Rostrom's claims of defective work. ECF No. 281-15. There is thus a genuine dispute about whether these costs were expected to exceed $400,000.

Second, EVCE argues the Court can infer that project completion was estimated to cost more than $400,000 because the costs exceeded that limit in practice. Specifically, EVCE asserts that it spent $529,000 to finish four Punch List items and determined that $124,000 was

needed to provide missing continuous emissions monitoring system ("CEMS") equipment. ECF No. 246-2 at ¶ 8. Yet these costs too are disputed.

The largest of these expenses was a $413,000 water treatment system, without which the costs would not have exceeded $400,000. *Id.* at ¶ 10. But it is not clear that this system was actually a Punch List item. The EPC contract defines the Punch List as "a list of unfinished portions of the Work or required repairs or replacements as specified by [EVCE] in consultation with Wellons," first developed "[w]hen Wellons believes that it has achieved Substantial Completion for the Project." ECF No. 246-1 at 56. The contract further provides that "[o]nce Substantial Completion of the Project has been achieved, Wellons and [EVCE] shall thereafter mutually prepare an updated Punch List for the Project." *Id.* This is the Punch List that is to be used in determining whether Final Completion has taken place. *Id.*

The initial Punch List does not mention a water treatment system. *See* ECF Nos. 281-1, 281-5, 281-7. I do not see the "updated Punch List" in the record, but Wellons' March 12, 2014 "open items list" does not include a water treatment system either. *See* ECF No. 281-12. On April 14, 2014, however, EVCE took issue with the system, writing: "While the water treatment equipment design may be functional, it is certainly not a good or cost effective design choice." ECF No. 281-13 at 8. A letter from EVCE on October 7, 2014 says that the updated Punch List had been "previously provided to Wellons," and the attached "revised" list includes the water treatment plant. ECF No. 246-2 at 12, 14. But Wellons objected to the inclusion of this equipment on the Punch List in October and November of that year. ECF No. 281-14 at 2; ECF No. 281-18 at 2. I therefore cannot be sure that the updated Punch List includes the water treatment system, and I doubt that EVCE could unilaterally revise such a list when the EPC

contract recognizes only a "mutually prepare[d] . . . updated Punch List" after Substantial Completion in December 2013.

Even if the updated Punch List required Wellons to provide a water treatment system, summary judgment would be inappropriate because the parties dispute whether Wellons satisfied this contractual duty. As noted above, EVCE admits that Wellons installed some water treatment equipment but complains that it was "not a good or cost effective design choice" and "does not fit the 'prevailing industry standards.'" ECF No. 281-13 at 8. Wellons responds that EVCE created the problem by failing to provide a raw water supply that meets the contract's specifications, and it asserts that the system "*is* consistent with industry standards." ECF No. 281-18 at 3 (emphasis added). Wellons also writes that EVCE "installed [the] additional equipment to attain [raw water supply] specifications." ECF No. 281-14 at 6. Whether EVCE could use its reasonable discretion to require Wellons to install more water treatment equipment is thus an issue of disputed material fact.

Third, defendants contend that the Court can infer that the remaining Punch List items were estimated to cost more than $400,000 because Wellons spent $542,095 between April and December 2014 on the project. *Compare* ECF No. 247-1 at 11, *with id.* at 2. But this aggregate number is unhelpful because it represents a mix of "production labor, installation labor, engineering labor, purchased components and materials issued, and other costs such as subcontractors" for all work on the project—not just enumerated Punch List items. ECF No. 281-17 at 94:16–24. There is also no way to tell whether these expenditures addressed incomplete Punch List items before Final Completion or repairs of "defects in design, materials and equipment" for the same items after Final Completion. *See* ECF No. 246-1 at 54, 56. And a

10

reasonable juror could still conclude that the completion cost was estimated to be less than $400,000 even if the actual cost was ultimately $542,095, a roughly one-third cost overrun.

Another issue underlying each of defendants' arguments here is that Final Completion "shall be deemed to occur" as soon as the remaining Punch List items are estimated to cost $400,000 or less. If it is true that EVCE and Wellons spent substantial sums completing Punch List items, then the remaining completion costs should have dipped below $400,000 at some point between April and December 2014. Yet defendants argue not just that Final Completion was not achieved when Wellons said it was, but that Final Completion was not achieved at all. I see no basis for this view. For all of these reasons, summary judgment is denied on this question.

### 3. *Contractually Required Equipment.*

Defendants also argue that Wellons breached the EPC contract by failing to provide certain required equipment. Besides the prerequisites described above, Final Completion requires "perform[ance] in all material respects the obligations of" the contract. ECF No. 246-1 at 56. Defendants allege that Wellons failed to install four material pieces of equipment: a backrake, an electromagnet, a CEMS, and equipment to provide demineralized water for the cooling tower.

As part of the facility's fuel delivery system, Wellons was required to provide a "truck dumper and hopper" with nine general features, including a "receiving hopper backrake." ECF No. 246-1 at 8–9. Wellons admits that it did not install such a backrake, but it explains that a backrake "wasn't needed." ECF No. 246-4 at 69:14–15. If it is true that the facility did not need a backrake, then this equipment could hardly be considered material. Additionally, the Court has

allowed Wellons to submit a supplemental expert report to rebut defendants' report on the cost of a backrake, ECF No. 279, so the significance of this omission is not undisputed.

The fuel delivery system also called for a "receiving conveyor," which was to include "a moveable plate electromagnet to remove metal particles." ECF No. 246-1 at 9. Wellons again admits that it did not install this equipment, but explains that it installed a permanent magnet instead because its "engineers believed that [this magnet] was an improvement." ECF No. 246-4 at 70:10–13. If that is accurate, then Wellons' choice to go beyond the contract's minimum requirements amounts to performance of the material aspects of its contractual duties. Either way, defendants allege that an electromagnet costs only $45,000, just a drop in the bucket for a contract worth about $40 million. *See* ECF No. 246-2 at 3; ECF No. 247-1. A reasonable juror could find Wellons' failure to install the correct magnet immaterial.

Next, the EPC contract required Wellons to install a CEMS for the facility's furnace system. ECF No. 246-1 at 26. Some of the CEMS's capabilities would be determined "depending upon [EVCE's] permit requirements." *Id.* But EVCE's permit ended up not requiring all of the CEMS equipment, so Wellons, in consultation with EVCE, did not install an unnecessary system and instead gave EVCE a credit for this avoided cost. ECF No. 246-4 at 81:1–12; ECF No. 281-18 at 1. Still, Wellons alleges that it supplied enough CEMS equipment to comply with the permit. ECF No. 281-18 at 1. Viewing these allegations in the light most favorable to Wellons, I cannot hold that it failed to perform a material aspect of the contract here.

Last, the facility's boiler needed an "integrated water treatment system" to "remove dissolved minerals for use as boiler makeup water and for cooling tower makeup water." ECF No. 246-1 at 18. This water treatment system was supposed to be "based upon a review of a

water analysis performed on samples provided by" EVCE. *Id.* As discussed in the previous section, the two sides dispute whether Wellons provided adequate equipment. EVCE complains that the water treatment equipment was "not a good or cost effective design choice" and "does not fit the 'prevailing industry standards,'" ECF No. 281-13 at 8, while Wellons contends that the system "is consistent with industry standards," ECF No. 281-18 at 3. Wellons also asserts that the water treatment system would have sufficed for water that matched EVCE's samples, but EVCE failed to provide a comparable raw water supply and consequently "installed [the] additional equipment to attain [raw water supply] specifications." ECF No. 281-14 at 6; ECF No. 281-18 at 3. And Wellons alleges that the parties mistakenly included the language about the cooling tower water because companies "never demineralize cooling water makeup." ECF No. 246-4 at 71:20–72:13. At best, the question whether the contested aspect of the water treatment system comprises a material part of the EPC contract is a disputed material fact.

Overall, defendants' argument that these pieces of equipment were material to the contract is hard to reconcile with the December 2013 opinion of EVCE's engineer that the remaining work was "minor." ECF No. 281-9 at 21. Indeed, defendants do not try to argue that these issues blocked Final Completion because the equipment was "material to the safe and reliable operation of the facility." ECF No. 246-1 at 56; *see* ECF No. 246. For all of these reasons, summary judgment is denied on this issue as well.

### 4. *Withholding Payment.*

Defendants argue that EVCE was entitled to withhold payment because Wellons did not perform its obligations under the EPC contract. But because there is a genuine dispute about whether Wellons adequately performed, there is also a dispute about whether EVCE was

subsequently entitled to withhold payment.  Summary judgment is thus denied on Wellons'
breach of contract claim.

### B.  Mechanic's Lien Foreclosure.

Wellons recorded a mechanic's lien against the facility's property under Colorado
Revised Statutes § 38-22-109.  Defendants raise two challenges to this lien: (1) that Wellons
failed to perfect its lien under the Colorado statute, and (2) that Wellons waived its statutory
rights.  Because I find the first argument dispositive, I need not address the second defense.

Under § 38-22-109, a party asserting a mechanic's lien must serve the property owner
with "notice of intent to file a lien statement" before recording the lien statement itself.  Colo.
Rev. Stat. § 38-22-109(3).  The provision then requires that "an affidavit of such service or
mailing . . . shall be filed for record with [the lien] statement and shall constitute proof of such
service."  *Id.*

Despite complying with the other statutory requirements, Wellons neglected to record an
affidavit of service.  Defendants argue that this omission as fatal to Wellons' lien, while Wellons
responds that its lien is valid because it substantially complied with the statute and provided
actual notice of its intent to file a lien statement.

When interpreting Colorado's mechanic's lien statute, the Court must apply the most
recent decisions by the state's highest court.  *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866
(10th Cir. 2003).  "Where no controlling state decision exists, the federal court must attempt to
predict what the state's highest court would do."  *Id.*  The Colorado Supreme Court has not yet
decided whether a claimant's failure to record an affidavit of service invalidates a mechanic's
lien, but Colorado courts have weighed in on related questions.

It is settled law in Colorado that "the mechanics' lien statute should be strictly construed with respect to those acts necessary to perfect the lien," although it "should be construed liberally as to the provisions . . . that are remedial in nature." *Powder Mountain Painting v. Peregrine Joint Venture*, 899 P.2d 279, 281 (Colo. App. 1994); *accord Schneider v. J.W. Metz Lumber Co.*, 715 P.2d 329, 332 (Colo. 1986). In other words, "those who wish to claim the benefits of the lien must prove compliance with all statutory requirements necessary to establishing entitlement thereto." *Richter Plumbing & Heating, Inc. v. Rademacher*, 729 P.2d 1009, 1012 (Colo. App. 1986). Colorado thus aligns with the majority of states that require more than just substantial compliance with a mechanic's lien statute. *See* 53 Am. Jur. 2d Mechanics' Liens § 179; 56 C.J.S. Mechanics' Liens § 102. This rule has been followed in Colorado since at least 1898, and it is justified on the grounds that the mechanic's lien statute is in derogation of the common law. *Everitt Lumber Co. v. Prudential Ins. Co. of Am.*, 660 P.2d 925, 926 (Colo. App. 1983).

Applying this strict construction rule, the court in *Everitt Lumber* held that a claimant's "failure to comply strictly with" the lien statute's affidavit requirement "renders its lien unenforceable." 660 P.2d at 926. In that case, the claimant recorded an affidavit of service for the property's owners but failed to file an affidavit for service of the principal contractor. The court concluded that this deficiency made the lien invalid even though the claimant argued "the evidence established that the principal contractor had actual notice of [the claimant's] intention to file a lien statement and of the amount claimed." *Id.* Indeed, the court cited favorably another Colorado Court of Appeals case which held that defendants "need not establish prejudice" from a claimant's failure to comply with the mechanic's lien statute to invalidate a lien. *Daniel v. M. J. Dev., Inc.*, 603 P.2d 947, 949 (Colo. App. 1979).

In light of these precedents, I am inclined to believe that Wellons' failure to record an affidavit of service renders its lien unenforceable.  Strictly construed, the mechanic's lien statute admits no exception to the affidavit requirement.  Even though defendants may have had actual notice of Wellons' intent to file a lien statement, defendants need not show that they would suffer prejudice to defeat the lien claim.  Wellons concedes it did not fully comply with § 38-22-109, so it cannot meet its burden of proving a right to a lien under that statute.

Wellons unpersuasively cherry-picks a few cases to defend its lien.  First, Wellons quotes the following passage from *Feldewerth v. Joint Sch. Dist. 28-J*:

> However, in the absence of explicit statutory language requiring it, a statute requiring the providing of notice by a specified means need not be strictly applied.  In such a case, the statutory requirement may be waived, or a party may be estopped from insisting upon a literal compliance with its terms.  *See Brock v. Nyland*, 955 P.2d 1037 (Colo. 1998) (if statutory requirement for notice is not jurisdictional, requirement may be waived).
>
> In addition, if the type of notice required is not a jurisdictional requirement, actual notice may be substituted for it.

3 P.3d 467, 471 (Colo. App. 1999).  But defendants complain that Wellons did not record proof of service, not that it provided notice incorrectly.  And the *Feldewerth* court was discussing dismissal of an employee, not perfection of a mechanic's lien; the mechanic's lien statute explicitly requires recording an affidavit of service or mailing.  *Feldewerth* therefore has no bearing on the lien statute's affidavit requirement.

Next, Wellons tries to distinguish *Everitt Lumber* by characterizing it as "a situation where there was no evidence that a required party had been served with a notice of intent."  ECF No. 281 at 11.  According to Wellons, "Nothing in the opinion indicates that the contractor was served with notice of the intent to lien, but it can be assumed that notice of the lien claimant's

intent occurred when the lien claimant sought to intervene in the lawsuit." *Id.* I do not read the case this way. The appellate court did not make factual findings, of course, but it rejected as a matter of law appellant's argument that, "since the evidence established that the principal contractor had actual notice of [the claimant's] intention to file a lien statement and of the amount claimed, filing of the affidavit was not required." *Everitt Lumber*, 660 P.2d at 926. Both the trial and appellate court found the lien invalid "for failure to record an affidavit of service of notice of intent upon the principal contractor"—a question the courts probably would not have reached if the principal contractor had not been served with notice in the first place. It thus appears that, like here, the contractor was served with notice of intent to file a lien statement, but the claimant failed to record an affidavit of this service.

Wellons then discusses *Sure-Shock Elec., Inc. v. Diamond Lofts Venture, LLC*, 356 P.3d 931 (Colo. App. 2014). In *Sure-Shock*, the court held that under § 38-22-109(6), a lien claimant need not provide notice of an amended lien statement that corrected only the amount of a perfected lien. *Id.* at 935. In so holding, the court mistakenly described *Everitt Lumber* as distinguishable because "the lien claimant[] in [that] case[] failed to provide the property owner[] with notice before filing a lien statement." *Id.* at 935. As noted above, however, the lien claimant in *Everitt Lumber* maintained that the contractor did have "actual notice," but the court still found the lien invalid because the claimant failed to record an affidavit of service. *Everitt Lumber*, 660 P.2d at 926. Wellons is therefore wrong to interpret *Sure-Shock* as holding that "it is providing notice, not filing proof of service, that is important when determining whether lien procedures have been followed." ECF No. 281 at 11. Both are important under Colorado's strict

construction rule.  *Sure-Shock*'s interpretation of § 38-22-109(6)'s requirements for amending an existing lien does not affect § 38-22-109(3)'s requirements for perfecting a new lien.

Finally, Wellons cites *United Floor Co. v. Eigel*, 807 P.2d 1209, 1210 (Colo. App. 1990). In that case, the lien claimants executed a notice of intent, a lien statement, and affidavits of service all on the same day, so the affidavits swore to the future fact that the notice of intent had been mailed at least ten days prior to recording with the county clerk.  The court found that notwithstanding this defect in the affidavits' contents, "the lien claimants did comply with all statutory requirements."  *Id.*  After all, nothing in the mechanic's lien statute requires an affidavit of service to be executed after the expiration of the ten-day period between service and filing. *See* Colo. Rev. Stat. § 38-22-109(3).  The *United Floor* court then added, somewhat gratuitously, that "the plaintiff substantially complied with the statute, and the purpose of the statute was fulfilled."  *Id.*  But this dictum does not change the strict construction rule.  Even though Wellons substantially complied with the mechanic's lien statute, its failure to completely comply renders its lien invalid.  Summary judgment is thus granted on this claim.

### C. Fraudulent Transfers.

Wellons brings its fraudulent transfer claim under the Colorado Uniform Fraudulent Transfer Act ("CUFTA"), as codified at Colorado Revised Statutes § 38-8-105 and § 38-8-106. According to Wellons, EVCE received federal grant money to pay for Wellons' work in September 2014, but EVCE wrongfully transferred the money to Evergreen, which in turn illicitly distributed the money to Clearwater, Western, CFF, WRFP, Mr. Rostrom, and Mr. Wait.

ECF No. 139 at ¶¶ 51–65. Defendants contend that Wellons cannot establish any of the evidence necessary to support its claim under either statutory provision.[1]

### 1. *Section 38-8-105.*

Under § 38-8-105, a transfer is intentionally fraudulent as to a creditor if it was made with the intent to hinder, delay, or defraud the creditor. Colo. Rev. Stat. § 38-8-105(1)(a). Alternatively, a transfer is constructively fraudulent if the debtor did not receive "reasonably equivalent value," and its remaining assets were "unreasonably small" in relation to its business or the debtor intended, believed, or should have believed that it would incur debts beyond its ability to pay them as they became due. *Id.* § 38-10-105(1)(b).

Although defendants assert that Wellons cannot establish either basis for this claim, they attack only the intentional fraud theory.[2] *See* ECF No. 246 at 19; ECF No. 284 at 4–5. I therefore consider any argument against Wellons' constructive fraud theory to be waived for present purposes.

In determining whether a transfer was intentionally fraudulent, courts must consider a nonexclusive statutory list of "badges of fraud." *See* Colo. Rev. Stat. § 38-8-105(2). First, defendants concede there is evidence that at least some of the transfers at issue here were to "insiders." *See* ECF No. 246 at 19; ECF No. 287 at 4–5; *infra* Part C.2. Second, Wellons

---

[1] In a footnote, defendants claim that Wellons has not even established that it is a "creditor" under the CUFTA because it "has been paid in full." ECF No. 246 at 16 n.15. That is disputed, to say the least.

[2] Defendants' response to Wellons' §38-8-106 claim—arguing in part that EVCE and Evergreen received reasonably equivalent value for the transfers "and were solvent at all relevant times"—does not address Wellons' § 38-8-105 claim either. Sections 38-8-105 and 38-8-106 employ somewhat different standards. Under § 38-8-105, Wellons can state a claim without proving actual insolvency by showing that defendants "engaged . . . in a business or a transaction for which the remaining assets of the debtor were unreasonably small," or that they "[i]ntended to incur, or believed or reasonably should have believed that [they] would incur, debts beyond [their] ability to pay as they became due." Colo. Rev. Stat. § 38-8-105(1).

believes that Mr. Rostrom and Mr. Wait retained control over the funds after the transfer. ECF No. 281 at 17; *see also, e.g.*, ECF No. 281-25 at 18:13–18, 21:14–18, 30:17–23 (identifying Mr. Rostrom and Mr. Wait as the directors of Evergreen and Evergreen as the owner and manager of EVCE); ECF No. 281-29 at 15:2–7 (identifying Mr. Wait as the manager of WRFP). Third, Wellons asserts that EVCE did not disclose to Wellons that it had received the federal grant until discovery had taken place in this case. ECF No. 281 at 17. Fourth, Wellons made a formal demand for payment within weeks of EVCE receiving the federal grant money, suggesting that defendants may have transferred this money in anticipation of a lawsuit. *See, e.g.*, ECF No. 246-8 (executing a mechanic's lien against EVCE in October 2014). Under the eighth factor, I see that Evergreen withdrew nearly $8 million "as a reduction of the investment" in EVCE, and that Evergreen immediately loaned some of this money to Clearwater, Western, and Mr. Rostrom. ECF No. 246-11 at 6, 12–16. None of these transfers appears to have been made for reasonably equivalent value. *See* Colo. Rev. Stat. § 38-8-104; *infra* Part C.2. Last, under the ninth factor, I note Wellons' expert witness has opined that EVCE was insolvent as of December 31, 2014.[3] ECF No. 282. Taken all together, there is a genuine dispute about whether defendants

---

[3] Defendants protest that Wellons' third amended complaint does not allege that EVCE was insolvent, and they assert that further amendment of the complaint would be prejudicial. Although defendants are correct that the complaint says only "[Evergreen] was insolvent," ECF No. 139 at ¶ 57, I must construe the pleadings so as to do justice and freely give leave for Wellons to amend its pleadings when justice so requires, Fed. R. Civ. P. 8(e), 15(a)(2). Wellons explicitly claimed that EVCE was insolvent throughout the first year of this litigation in its initial complaint, first amended complaint, and second amended complaint. *See* ECF No. 1 at ¶ 54; ECF No. 62 at ¶ 55; ECF No. 85 at ¶ 55. It appears that Wellons inadvertently deleted this reference to EVCE from its third amended complaint, but this revision makes little sense when EVCE is a wholly owned subsidiary of Evergreen and Evergreen apparently can pull its money out of EVCE at any time—how could Evergreen be in the red if EVCE was in the black? *See* ECF No. 246-11 at 6; ECF No. 281 at 21:14–18. Because defendants had express notice of Wellons' allegation for most of this case and implicit notice since Wellons filed its third amended complaint, I construe Wellons' pleading as alleging that EVCE was insolvent and, if any party thinks it is necessary, I will allow Wellons to file a fourth amended complaint to add "EV[CE] and/or" back in.

transferred the federal grant funds with actual intent to defraud Wellons. Summary judgment is thus denied on this question.

### 2. Section 38-8-106.

Section 38-8-106 provides eligible creditors two additional causes of action for constructive fraud when (1) the debtor did not receive "reasonably equivalent value" and was either insolvent or became insolvent as a result of the transfer, or (2) the transfer was made to an insider for an antecedent debt at a time when the debtor was insolvent, and the insider had reasonable cause to believe the debtor was insolvent. Colo. Rev. Stat. § 38-8-106. Defendants argue that Wellons cannot support either claim.

First, defendants contend that EVCE and Evergreen received reasonably equivalent value for every transfer. Value is given if property is transferred or an antecedent debt is secured or satisfied, but not if a mere unperformed promise is made outside of the ordinary course of business. Colo. Rev. Stat. § 38-8-104(1). As mentioned above, however, it appears that at least some of the transfers were not made for value. On September 25, 2014 Evergreen withdrew nearly $8 million from EVCE "as a reduction of the investment" in EVCE and immediately started spending this money, including making new loans (i.e., receiving unperformed promises to repay) to Clearwater, Western, and Mr. Rostrom. ECF No. 246-11 at 6, 12–16.

There is no evidence that any of EVCE or Evergreen's transfers were made in the ordinary course of business. That inquiry "requires a consideration of the pattern of payments or secured transactions engaged in by the debtor and the insider prior to the transfer challenged," Colo. Rev. Stat. § 38-8-109 cmt. 6, yet defendants submit no evidence of any transactions between these entities before September 25, 2014, *see* ECF No. 246-11.

Defendants also argue that EVCE and Evergreen were solvent before and after these transfers. Wellons' expert disagrees. *See* ECF No. 282 at 12. We therefore have a genuine dispute as to a material fact. Defendants can marshal their arguments against this expert's opinion at trial.

Defendants then claim there is no evidence that Mr. Rostrom, Mr. Wait, Western, or Clearwater was an insider of EVCE. EVCE's insiders include its directors, its officers, and people in control of it, as well as its affiliates and their insiders. *See* Colo. Rev. Stat. § 38-8-102(8)(b),(d). Its affiliates include any entity that directly or indirectly owns or controls at least twenty percent of its outstanding voting securities, and its sister corporations that are similarly owned or controlled. *Id.* § 38-8-102(1)(a), (b). Mr. Rostrom and Mr. Wait are the officers and directors of Evergreen, which owns EVCE, so they were at least affiliate insiders of EVCE. *See* ECF No. 281-25 at 18:13–18, 21:14–18, 30:17–23. Western was a shareholder in Evergreen and Mr. Wait manages and retains an ownership interest in the company, so it may have also been an affiliate of EVCE. *See id.* at 49:25–50:5; ECF No. 281-27 at 13:14–19. Clearwater was initially managed by Western and Mr. Rostrom, and its members are Mr. Rostrom's and Mr. Wait's wives, so it might have been indirectly controlled like a sister corporation, and thus might have been an affiliate of EVCE too. *See* ECF No. 281-28 at 9:1–9, 11:24–12:2. Consequently, there is sufficient evidence to support Wellons' claim that these four are insiders.

Last, defendants assert that Wellons has no evidence that any transferee knew about EVCE or Evergreen's alleged insolvency. However, the relevant question is not whether they had actual knowledge but whether they had "reasonable cause to believe" that the two companies were insolvent. Colo. Rev. Stat. § 38-8-106(2). If Wellons is right that EVCE and Evergreen

were insolvent and were under common management by or with the transferees, then a reasonable juror could find that these transferees had reason to believe EVCE and Evergreen were insolvent. Summary judgment is therefore denied on this issue.

### D. Civil Conspiracy.

Wellons' civil conspiracy claim depends on its fraudulent transfer claim for an overt unlawful act. As a result, defendants argue that the civil conspiracy claim must fail for the same reasons as the fraudulent transfer claim. But because the fraudulent transfer claim survives summary judgment, the civil conspiracy claim survives too.

### E. Breach of Directors' Duties.

Finally, Wellons alleges that Mr. Rostrom and Mr. Wait improperly authorized transfers of funds from Evergreen, rendering Evergreen unable to pay its debts to Wellons. Under Colorado law, directors and officers have a duty not to vote for shareholder distributions that would preclude payment of corporate debts. Colo. Rev. Stat. § 7-106-401(1).

Defendants raise three meritless arguments against this claim. First, they misread Wellons' complaint as alleging liability based on EVCE's transfers, but Wellons alleges liability only for Evergreen's transfers. *See* ECF No. 139 at ¶¶ 71–76. Second, they contend it is undisputed that Evergreen was solvent, but this issue is disputed. *See* ECF No. 282 at 12. And third, they argue that Wellons does not have standing to bring a director liability claim because it is not a shareholder of Evergreen, but a corporation's creditors also have standing to bring such a suit. *See Alexander v. Anstine*, 152 P.3d 497, 502 (Colo. 2007).

As discussed immediately below, third-party defendant Wellons Group, Inc. has moved for leave to assert a cross-claim against Mr. Rostrom and Mr. Wait. ECF No. 286. The Court

will grant that motion, effectively substituting Wellons Group, Inc. for Wellons, Inc. as the proper party to assert the claim that was Wellons, Inc.'s Seventh Claim for Relief. Accordingly, while I have resolved the merits of the motion for partial summary judgment in Wellons' favor on this claim, the Seventh Claim is deemed withdrawn in favor of the new cross-claim.

## II.  WELLONS GROUP, INC.'S MOTION FOR LEAVE TO ASSERT CROSS-CLAIM.

In this motion, ECF No. 286, Wellons Group, Inc. states that it has determined that it, not Wellons, Inc., is the appropriate Wellons entity to assert the claim that was asserted as plaintiff's Seventh Claim for Relief. Defendants assert that the motion is untimely and futile. ECF No. 288. The issues raised in the Seventh Claim for Relief are neither new nor untimely; and, as indicated earlier in this order, they have survived summary judgment. This motion simply substitutes the correct Wellons entity as the proponent of the claim. Substitution of the correct entity creates no unfair prejudice. On the contrary, it permits the issues raised in this case to be fully addressed and resolved. The motion is granted.

## III.  DEFENDANTS' MOTION IN LIMINE RELATING TO FRAUD CLAIMS.

Defendants ask the Court to prohibit Wellons from introducing evidence regarding its fraud claims unless and until Wellons establishes its breach of contract and related claims. ECF No. 290. However, I agree entirely with Wellons' response, ECF No. 293, that this amounts in substance to a rehash of defendants' motion to bifurcate which the Court previously resolved against them. Denied.

## IV.  PLAINTIFF GCUBE INSURANCE SERVICES, INC.'S *IN LIMINE* MOTION.

GCube moves *in limine* for an order excluding certain evidence potentially relevant to a fire at the EVCE facility that occurred on December 13, 2014. ECF No. 292. This includes

evidence that the fuel conveyor system at the facility was not equipped with a fire suppression system; evidence concerning allegedly reduced water flow from the fire hydrants at the facility; and evidence concerning the opinions of an expert retained by Wellons who died after issuing his expert report. The Court has reviewed the motion and Wellons' response, ECF No. 303. At this point the Court is not sufficiently familiar with the fire suppression issue, or the opinions of the two experts whom Wellons has apparently endorsed in substitution for the deceased expert, to feel comfortable attempting to resolve these issues. Accordingly, the Court exercises its discretion to decline to rule on these issues *in limine.* Rather, they will be addressed as appropriate in the context of the evidence and arguments presented during the trial.

## ORDER

For the foregoing reasons,

1. Defendant's Motion for Partial Summary Judgment, ECF No. 246, is GRANTED IN PART and DENIED IN PART. The motion is granted to the extent that Wellons' Third Claim for Relief (foreclosure of mechanic's lien) is dismissed with prejudice. The motion is otherwise denied.

2. ECF No. 256, which is another version of ECF No. 246, is MOOT.

3. Wellons Group, Inc.'s Motion for Leave to Assert a Cross-Claim, ECF No. 286, is GRANTED. The cross-claim replaces plaintiff's Seventh Claim for Relief, which is deemed withdrawn.

4. Defendants' Motion *In Limine* Relating to Fraud Claims, ECF No. 290, is DENIED.

5. GCube Insurance Services, Inc.'s *In Limine* Motion, ECF No. 292, is DENIED.

DATED this 22nd day of May, 2017.

BY THE COURT:

R. Brooke Jackson
United States District Judge